# IN THE COURT OF APPEALS OF IOWA

No. 15-1918
Filed September 28, 2016

IN RE THE MARRIAGE OF JESSE JACOB LEIB
AND ABBY JO LEIB

Upon the Petition of
JESSE JACOB LEIB,
    Petitioner-Appellee,

And Concerning
ABBY JO LEIB,
    Respondent-Appellant.

_____

Appeal from the Iowa District Court for Dubuque County, Monica L.

Ackley, Judge.


Abby Jo Leib appeals the physical-care provision and certain property and

liability-allocation provisions of the decree dissolving her marriage to Jesse

Jacob Leib. **AFFIRMED AS MODIFIED AND REMANDED.**


Jenny L. Weiss of Fuerste, Carew, Juergens & Sudmeier, P.C., Dubuque,

for appellant.

Zeke R. McCartney of Reynolds & Kenline, L.L.P., Dubuque, for appellee.


Considered by Potterfield, P.J., and Mullins and McDonald, JJ.

**MULLINS, Judge.**

Abby Jo Leib appeals the physical-care provision and certain property and liability-allocation provisions of the decree dissolving her marriage to Jesse Jacob Leib. We affirm as modified and remand.

## I. Background Facts and Proceedings

Abby and Jesse were married in June 2008. The parties have four minor children: S.L., B.L, G.L., and T.L., who were fifteen, six, four, and two, respectively, at the time of trial.

Abby, born in 1982, has a degree in welding and business management, is employed as a welder, and makes $29,000 annually. Abby began this employment in February 2015. Her workday begins at 9 a.m. and usually ends at 6 p.m., and she works a forty-hour workweek, although her schedule is flexible to accommodate the children's schedules. Abby is able to get the children up, ready, and off to school or daycare in the morning. From 2008 to 2012, Abby ran an in-home daycare while providing care to her own children. From 2012 to 2014, she was exclusively a stay-at-home mother, and ran a small leather business out of the home. During the course of the marriage, Abby was the primary caregiver to the children.[1] It is undisputed the children are healthy and well-adjusted and the school-aged children are doing well academically. It is further undisputed that both parties love their children. Some testimony provided, however, indicated the eldest child had a strained relationship with her father, had heated fights with her father, and preferred to live with her mother.

---

[1] At trial, Jesse conceded it was by agreement of the parties that Abby stayed home and cared for the children, an arrangement they had intended to continue until all of the children were in school.

Jesse, born in 1972, is employed as an electrician by John Deere and makes in excess of $90,000 annually. Jesse's usual shift commences at 6 a.m. and ends at 2:30 p.m., although he works overtime as well.[2] At trial, Jesse indicated he had some flexibility in his scheduling, allowing him to start at 6:30 a.m. and to adjust his overtime and not work on the weekends he has the children. However, the record reflects Jesse works most days of the week and is regularly in before 6:30 a.m.[3] On the days he has the children, Jesse intends to drop the three youngest children off with his parents in the morning before heading to work because of his early shift. The children will then sleep at their grandparents' house until the grandparents take them to school. The parties attempted to institute this routine when the divorce was pending, but the children wanted Abby to take them to school, so she continued to cover the morning hours of the children's day. Since Abby has returned to work, Jesse's parents provide daycare for the youngest child.

At the time of trial, both parties resided in the marital residence in Dubuque, Iowa, although Abby was requesting to move to Cuba City, Wisconsin, closer to where she works and her family resides. Abby's parents work part-time

---

[2] This overtime is often worked earlier in the day, with Jesse arriving at work as early as 2 a.m.

[3] Jesse's clock-in records for 2014 show he worked every day in January except for five days, every day in February except for two days, every day in March except for four days, every day in April except for six, every day in May except for five days, every day in June except for two days, and every day in July except for three days. In August, he took off eight days in a row, in addition to four other days. In September, he worked all but five days, and he worked every day in October. Jesse took off the first nine days and the last four days in November. He also took off the last eight days in December. In 2015, Jesse worked all but five days in January, all but three days in February, and all but one day in March.

jobs and are available to assist with childcare when needed. Cuba City is approximately a twenty-minute commute from Dubuque.

Abby testified to a marriage plagued with communication issues. She stated Jesse was controlling, they fought constantly, usually about the children and money, and saw four different marriage counselors during their six years of marriage. In June 2014, Abby moved out of the marital home with the children.

On July 3, 2014, Jesse filed a petition for dissolution of marriage. That same day the court entered an order requiring that the children remain within the jurisdiction of the court; Abby then moved back into the marital home with the children. In October, Abby filed a request for temporary relief, citing Jesse's anger and verbal abuse and requesting arrangements be made so she could move out of the marital home with the children. Following a hearing held January 29, 2015, the court entered its order requiring, among other things, that the children remain in the marital home, that Jesse agree before Abby could take the children to visit her family in Wisconsin, and imposing a child-care arrangement where the children rotated between the parents every four days.

Because of the temporary order, Abby remained in the marital home with the children. The parties agree their relationship continued to deteriorate due to the stress of the divorce and their living arrangement. At trial, Abby presented audio recordings of fights between herself and Jesse. In these recordings, Jesse screams and curses at Abby and berates her in front of the children. In one recording, the eldest child asked her parents to stop arguing and cursing because the younger children can hear them. Abby testified these recordings

reflected the regular communications between the parties. Jesse testified they often fight, with Abby also yelling and cursing in front of the children.

Abby also testified Jesse routinely called her stupid and selfish in front of the children; a journal Abby kept indicates these events predated the filing of the petition for dissolution. Abby's sister testified to a telephone call she had with Abby when she heard Jesse yelling at Abby and the children crying in the background. The district court also noted the parties had poor communication through text messaging.

The parties also had disputes over money—including the timeliness of bill payments, communication about when money was being removed from the accounts and how it was spent, and Jesse's removal of Abby from all financial accounts—such as checking accounts and credit accounts—in November 2013 so he could require her to request money before spending it. The parties also disputed the money Abby spent on the maintenance of the horses she owned—horses she had acquired prior to the marriage. Additionally, the parties disputed the appropriate approach to disciplining the children.

Abby testified Jesse was controlling both in the marriage and during the separation. The record reflects that, even before their separation, Jesse inquired extensively into Abby's plans and called others to inquire about Abby. Abby testified that, since the temporary order, Jesse has denied her the right to go visit her family with the children or granted her the right only after extensively questioning her about her plans. Jesse admitted to extensively inquiring about Abby's location and plans when she takes the children to visit her parents. Jesse

admitted he does not trust Abby, indicating he did not think Abby was at work when she said she was.

In May 2015, the parties filed a pretrial stipulation in which they agreed to the following relevant things: (1) the distribution of the dependency exemptions, (2) the distribution of their vehicles, checking and savings accounts, Abby's horses, and Abby's pension; and (3) the distribution of their liabilities, including an approximate $31,000 loan owed on Jesse's 401(k) policy, for which Jesse accepted liability. The parties disputed physical care and visitation, alimony, attorney fees, and the distribution of Jesse's 401(k), Jesse's pension, and monies held in a trust account.

At the conclusion of a three-day trial, the district court allowed Abby to move to Wisconsin and lifted any restrictions on her taking the children to Wisconsin. The dissolution decree was filed on June 29, 2015. In the decree, the court awarded joint custody and joint physical care of the children, with the children to rotate between the parents on a weekly basis. The decree contained the following provisions: Jesse would provide insurance for the children, Jesse would pay $935.97 monthly in child support, Jesse would pay alimony in the amount of $1000 per month for three years, Jesse would continue to carry life insurance policies on the children, and the parties would evenly divide 47% of Jesse's 401(k)—the portion Jesse argued and the court determined was a marital asset. Contrary to the parties' stipulation, the district court awarded Jesse the dependency exemptions for the three eldest children and Abby the dependency exemption for the youngest child and split the debt owed on the 401(k) evenly between the parties. The court awarded Jesse the marital home

and Abby the $6000 debt owed to her parents, and otherwise adopted the distribution set forth by the parties in the pretrial stipulation. The court also instructed Jesse to pay $3000 of Abby's attorney fees and court costs.

On July 13, 2015, Abby filed a motion to amend or enlarge, asking, among other things, that the court adopt the pretrial stipulation with regard to the dependency deductions, allocate the remainder of the monies held in trust accounts, and divide Jesse's pension between the parties. Jesse did not object to Abby's request regarding the dependency deductions or object to the division of the marital portion of his pension and also requested the monies held in trust be divided, at least in part, to cover Abby's attorney fee award. Jesse also filed a motion to amend or enlarge in which he requested, in relevant part, the court downward adjust its calculation of his annual income and require the children to attend school in Dubuque. Abby opposed any downward adjustment in Jesse's estimated income or payment.

Following the parties' respective motions to amend and enlarge, the court adjusted its calculation of Jesse's income to $90,512 and correspondingly his child support obligation, denied the parties' request to adjust the dependency deductions, and declined to divide Jesse's pension. The court required the parties to agree on where the children were to attend school or, in the event the parties were unable, required the children to remain in the Dubuque school system. Finally, the court designated $2652.04 of the money in trust to satisfy Jesse's obligation to pay for Abby's attorney fees and awarded Abby the remaining $2011.

Abby appeals.

## II.    Scope and Standard of Review

We review dissolution cases, which are tried in equity, de novo. Iowa R. App. P. 6.907; *In re Marriage of Schenkelberg*, 824 N.W.2d 481, 483-84 (Iowa 2012). While we give weight to the factual findings of the district court, especially when considering the credibility of witnesses, we are not bound by them. Iowa R. App. P. 6.904(3)(g). "Precedent is of little value as our determination must depend upon the facts of the particular case." *In re Marriage of Fennelly,* 737 N.W.2d 97, 100 (Iowa 2007) (citation omitted).

## III. Analysis

### A. Physical Care

Where child custody and physical care are at issue in marriage dissolution cases, the primary consideration is the best interests of the children. Iowa R. App. P. 6.904(3)(o); *In re Marriage of Will*, 489 N.W.2d 394, 397 (Iowa 1992). The court must consider joint physical care if requested by any party, and if it denies joint physical care, the court must make specific findings of fact and conclusions of law that awarding joint physical care is not in the children's best interests. Iowa Code § 598.41(5)(a) (2013); *In re Marriage of Hansen*, 733 N.W.2d 683, 692 (Iowa 2007). Our law provides a nonexclusive list of factors the court shall consider in determining a custodial arrangement, *see* Iowa Code § 598.41(3), as well as nonstatutory factors, *see Will*, 489 N.W.2d at 398 (citing *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974)). Factors to be considered in determining whether joint physical care is in the children's best interests include (1) continuity, stability, and approximation; (2)"the ability of spouses to communicate and show mutual respect"; (3) "the degree of conflict

between parents"; and (4) "the degree to which the parents are in general agreement about their approach to daily matters." *Hansen*, 733 N.W.2d at 696-99. Not all factors are given equal consideration, and the weight of each factor depends on the specific facts and circumstances of each case. *In re Marriage of Williams*, 589 N.W.2d 759, 761 (Iowa Ct. App. 1998).

First, we note the district court made no credibility findings. Occasionally, we are able to discern some credibility determinations from the findings of fact. That is not the case here. There are arguably no more than nine sentences in the findings of fact relating to custodial matters, but those findings only recognize "the parties love their children but have different parenting styles," "the parties [have] poor interaction in front of the children," there has been "yelling and sarcasm," the children are doing well, and the parties are struggling and there "is a great deal of anger and distrust." After reciting some of the applicable law, the decree provides us almost no analysis for review of the application of law to the facts. Consequently, there is little basis for us to give weight to the conclusions reached by the district court. *See generally* Iowa R. App. P. 6.904(3)(g).

On appeal, Abby alleges joint physical care was not properly before the district court and was not appropriately awarded. As to Abby's first argument, Jesse explicitly requested joint physical care in the parties' pretrial stipulation. Further, at trial, Jesse reiterated his request that the court award joint physical care. Accordingly, joint physical care was properly before the district court. We next turn to Abby's contention the district court should have awarded her physical care.

As we consider the factors of continuity, stability, and approximation, we note Abby has been the primary caregiver to these children for their entire lives. *See Hansen*, 733 N.W.2d at 700 (noting "[f]or most of the marriage, [the mother] has been the primary caregiver" and thus "[t]he concepts of continuity, stability, and approximation . . . cut strongly against joint physical care as a quality alternative least disruptive to the children and most likely to promote their long-term physical and emotional health"). Abby provided in-home care for the children through 2014. Around six months before trial, Abby returned to work—first part time and then full time. Even when working full time, Abby was responsible for the children in the mornings, as her work schedule allowed her to start work at a later hour than Jesse.

Jesse, on the other hand, has worked constantly to meet the financial needs of the family—putting in overtime and often working weekends. Trial testimony supports that, when not working, Jesse regularly spends at least one to two evenings a night away from the marital home relaxing at his friend's house. Since Abby has returned to work, Jesse often takes care of the children on the afternoons and evenings Abby is not around. The eldest daughter also watches the children and Jesse's parents help out. Plenty of testimony was presented to support that both parents cook meals, bathe the children, and attend their events. Abby indicated, however, that the vast majority of the responsibility for the children fell on her both before and after Jesse filed for dissolution. While Jesse disagrees with her division of the parental responsibilities, it is clear from the record that joint physical care does not mirror the caregiving of the parents predissolution. *See id.* at 697 (noting the relevant

consideration that "the caregiving of parents in the post-divorce world should be in rough proportion to that which predated the dissolution").

Next, we consider the parties' ability to communicate and show mutual respect. *See* Iowa Code § 598.41(3)(c); *Hansen*, 733 N.W.2d at 698. The record reflects the parties have a history of poor communication, with both parties cursing, name calling, and arguing in front of the children. While the district court noted the communication issues were exacerbated by the parties' forced cohabitation while the divorce was pending, trial testimony supports that these communication issues long predated the separation. Jesse feels Abby often ignores his questions, while Abby feels bombarded by a plethora of questions before Jesse will agree to what she feels are the simplest requests. As a result of financial disputes between the parties, Jesse removed Abby from all financial accounts to require her to request and explain her use of money. Further, Jesse admitted he does not trust Abby. *See Hansen*, 733 N.W.2d at 698 ("A lack of trust poses a significant impediment to effective co-parenting."). The record lacks the requisite evidence supporting the parties' ability to communicate and show respect.

As to the third factor, our supreme court has noted:

Joint physical care requires substantial and regular interaction between divorced parents on a myriad of issues. Where the parties' marriage is stormy and has a history of charge and countercharge, the likelihood that joint physical care will provide a workable arrangement diminishes. It is, of course, possible that spouses may be able to put aside their past, strong differences in the interest of the children. Reality suggests, however, that this may not be the case.

*Id.* While the district court believed the parties' love for their children would prevail after the parties were able to move into separate accommodations, the history of the parties' relationship does not support this. Even when Abby was visiting her family, Jesse's substantial distrust of Abby was evident by his repeated texting and calling her to inquire about the details of and reasoning for her stay. Moreover, "[t]he prospect for successful joint physical care is reduced when," as here, "one party objects to the shared arrangement." *Id.*

As to the fourth *Hansen* factor, which considers "the degree to which the parents are in general agreement about their approach to daily matters," *id.*, the district court found "[t]he parties love their children but have different parenting styles," with "one parent [being] liberal and the other [being] strict in the way of discipline techniques." The record reflects Abby previously wanted to homeschool the children, while Jesse was against homeschooling. The parties are unable to agree on appropriate discipline and where the children should be registered for school.

Upon our de novo review of the "total setting presented" in this case, based on our factual findings and applicable law recited above, we determine that joint physical care is not in the best interests of the children. *Id.*; *see also* Iowa Code § 598.41(5)(a). Having determined joint physical care is not in the children's best interests, we "must next choose which caregiver should be awarded physical care." *Hansen*, 733 N.W.2d at 700.

There is no dispute that both parents are suitable custodians for their children, capable of meeting their psychological and emotional needs. *See* Iowa Code § 598.41(3)(a)-(b); *see also Winter*, 223 N.W.2d at 166-67 (noting we must

consider the "emotional, social, moral, material, and educational needs of the child[ren]," the "characteristics of each parent," and the parent's ability to provide for those needs). Communication remains an issue for the parties, *see* Iowa Code § 598.41(3)(c), although the issue is, at least in part, mutual. However, both parents acknowledge the other parent is a good parent who loves the children. There is no indication either parent would interfere with the other's relationship with the children. *See id.* § 598.41(3)(e).

Again, "the factors of continuity, stability, and approximation are entitled to considerable weight" and favor placement of the children with Abby. *Hansen*, 733 N.W.2d at 700; *see also* Iowa Code § 598.41(3)(d). The children are healthy, well-adjusted, and performing well in school. *See Hansen*, 733 N.W.2d at 697 ("[S]uccessful caregiving by one spouse in the past is a strong predictor that future care of the children will be of the same quality."). We also note evidence was presented at trial that the eldest child preferred to live with her mother, although the child did not testify. *See* Iowa Code § 598.41(3)(f); *see also Winters*, 223 N.W.2d at 166-67 (noting we must consider "[t]he interpersonal relationship between the child and each parent" and "[t]he preference of the child, if the child is of sufficient age and maturity"). Although we recognize a potential change in schools could be disruptive in the short run, in total, we find the long-term best interests of the children are served by placing them in the physical care of their mother. We remand the matter for the district court to consider the appropriate liberal visitation to be awarded to Jesse in the best interests of the children and for recalculation of child support.

**B. Property Allocation**

Abby challenges four economic provisions of the dissolution decree: (1) the division of Jesse's 401(k); (2) the division of the loan on the 401(k); (3) the division of Jesse's John Deere pension; and (4) the division of the dependency exemptions. In matters of property distribution, we are guided by Iowa Code section 598.21. The parties in a dissolution action "are entitled to a just and equitable share of the property accumulated through their joint efforts." *In re Marriage of O'Rourke*, 547 N.W.2d 864, 865 (Iowa Ct. App. 1996). Iowa law does not require an equal division, but rather, "what is fair and equitable in each circumstance." *In re Marriage of Campbell*, 623 N.W.2d 585, 586 (Iowa Ct. App. 2001). "Equitable distributions require flexibility and concrete rules of distribution may frustrate the court's goal of obtaining equitable results." *In re Marriage of Driscoll*, 563 N.W.2d 640, 642 (Iowa Ct. App. 1997). Thus, "it is inherent in the court's equitable powers, to make appropriate adjustments, according to the unique facts of each case." *Id.*

**1. 401(k) Division**

In its decree, the district court determined 47% of the 401(k) constituted a marital asset, as Jesse testified he had been funding his 401(k) since 1995 and had rolled over his 401(k) through four jobs. The district court equally divided the 47% between the parties. Abby claims on appeal the entirety of the 401(k) should have been equally divided. We disagree with Abby's contention she is entitled to half of the entirety of the 401(k) and affirm the district court.

### 2. 401(k) Loan

In the pretrial stipulation, the parties agreed to the division of their marital property, except for Jesse's pension and 401(k) and the cash held in trust. Jesse accepted liability for the $31,706.29 loan taken against his 401(k). As addressed above, when dividing Jesse's 401(k), valued at $113,849.78, the district court adopted the division sought by Jesse, dividing only the portion that accrued during the parties' marriage. We determine it was inequitable for the district court to not adopt the distribution of the debt agreed to by the parties. We therefore modify the decree and assign the 401(k) loan to Jesse, in conformity with his agreement in the pretrial stipulation.

### 3. John Deere Pension

In the pretrial stipulation, the parties disputed the appropriate division of Jesse's John Deere pension. The division of the pension was not addressed in the decree. Both parties requested the district court address this omission in their respective motions to amend or enlarge: Abby sought to have the pension divided equally while Jesse sought to have only the marital portion divided equally. The court did not address the pension in its order on the motions. On appeal, Abby requests division in accordance with the *Benson* formula. *See In re Marriage of Benson*, 545 N.W.2d 252, 255-56 (Iowa 1996). Jesse argues the district court's failure to divide the pension is fair. The Iowa Code requires district courts to divide marital property between the parties. *See* Iowa Code § 598.21(1); *see also In re Marriage of McDermott*, 827 N.W.2d 671, 682 (Iowa 2013). In this case, the *Benson* formula would equitably divide this asset, and we see no reason to deviate from its application. We remand for the district court

to order the appropriate allocation and direct counsel to prepare the necessary qualified domestic relations order.

### 4. Income Tax Exemptions

Abby appeals the district court's deviation from the pretrial stipulation in its award of tax exemptions and credits for the children. In light of the above change in the physical-care arrangement, we remand for the district court to determine the appropriate division of the income tax exemptions and credits for the children. *See* Iowa Ct. R. 9.6; *see also In re Marriage of Okland*, 699 N.W.2d 260, 269-70 (Iowa 2005).

### C. Appellate Attorney Fees

Both parties request appellate attorney fees. "Appellate attorney fees are not a matter of right, but rather rest in this court's discretion." *Okland*, 699 N.W.2d at 270. "[I]n determining whether to award attorney fees," we consider "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *Id.* (citation omitted). Having considered these factors, we determine Jesse shall pay $2500 of Abby's appellate attorney fees. Costs shall be assessed to Jesse.

## IV. Conclusion

For the foregoing reasons, we modify the terms of the decree to award physical care of the children to Abby. We remand for a determination of visitation, child support, allocation of income tax exemptions and credits, and other related matters. We modify the decree to assign the 401(k) loan to Jesse and to allocate the John Deere pension pursuant to the *Benson* formula.

**AFFIRMED AS MODIFIED AND REMANDED.**